## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DANIEL LOZINSKY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| GEORGIA RESOURCES MGMT., LLC | ) |
| | ) |
| and | ) |
| | ) |
| GLOBAL METHANE PARTNERS, INC. | ) |
| | ) |
| Defendants. | ) |

Case No. 1:07CV00377

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, TO DISMISS THE COMPLAINT

Defendants, Georgia Resources Management, LLC and Global Methane Partners, Inc. (collectively, the "Defendants"), by and through their undersigned counsel, and pursuant to Rules 12(b) and 56 of the Federal Rules of Civil Procedure, move for summary judgment as to the claims set forth in Plaintiff's Complaint or, alternatively, to dismiss the Complaint ("Motion"). The grounds in support of Defendants' Motion are set forth in the accompanying Memorandum of Law, the affidavits and exhibits attached thereto which are incorporated herein by reference, and can be summarized as follows:

1.      Defendants are entitled to summary judgment as a matter of law as to Plaintiff's claim for unjust enrichment because he has failed to allege or present any evidence to show that the Defendants have not performed substantial work in connection with his investment money or that they have retained or put such money to other than its intended purpose--namely, to fund the development of commercial projects for the

recovery and utilization of coal-related products or other natural resources in Ukraine and Georgia.

2.      Defendants are entitled to summary judgment as a matter of law as to Plaintiff's claim for unjust enrichment because he freely and knowingly invested money in the Defendants' business operations knowing full well that there would be no guarantees on the amount of his investment return or the timing of such a return.  Plaintiff is a sophisticated investor who understood the risk involved with his investment and the fact that he would not be guaranteed a return of his full investment let alone a profit.

3.      The doctrine of estoppel bars Plaintiff's claim for unjust enrichment because he voluntarily provided investment money to the Defendants knowing full well the use of such money.  Relying on Plaintiff's conduct and his understanding as to the use of his investment funds, the Defendants applied this money to such use and it cannot be returned without loss to the Defendants.

4.      Plaintiff is an accredited investor under applicable SEC regulations and was always represented and advised by counsel in connection with his investment. Therefore, it strains credulity and defies common sense for Plaintiff to now assert that he is entitled to a complete return of this money which he so willingly and with deliberation invested in the Defendants' business operations.  If Plaintiff's position is accepted, it would mean that every investor who experiences a slump in his initial investment would be entitled to complete recovery of such investment.

Respectfully submitted,

BREGMAN, BERBERT, SCHWARTZ & GILDAY, LLC


By:    /s/ Edward P. Henneberry
       Edward P. Henneberry, # 15251
       Bregman, Berbert, Schwartz & Gilday, LLC
       7315 Wisconsin Avenue, Suite 800 West
       Bethesda, Maryland 20814
       (301) 656-2707
       *Counsel for Defendants*


## CERTIFICATE OF SERVICE


I hereby certify that the foregoing Motion for Summary Judgment or, in the Alternative, to Dismiss the Complaint together with the accompanying Memorandum of Law were served on this 4th day of April, 2007, upon the following by first-class mail, postage prepaid, and by email:

Robert C. Gill
Saul Ewing, LLP
2600 Virginia Avenue, N.W.
Suite 1000
Washington, D.C. 20037


/s/ Edward P. Henneberry
Edward P. Henneberry

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DANIEL LOZINSKY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **GEORGIA RESOURCES MGMT., LLC** | )     **Case No. 1:07CV00377** |
| | ) |
| **and** | ) |
| | ) |
| **GLOBAL METHANE PARTNERS, INC.** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

### MEMORANDUM OF LAW IN SUPPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, TO DISMISS THE COMPLAINT

## I.     STATEMENT OF UNDISPUTED FACTS

Global Methane Partners, Inc. ("GMP") was formed in 2004 for the purpose exploring opportunities in connection with the development of commercial projects for the recovery and utilization of Coal Bed Methane/Coal Mine Methane ("CBM/CMM") and the exploration and production of other natural resources in Ukraine and the country of Georgia.[1]  Georgia Resources Management, LLC ("GRM") is a distinct corporate entity affiliated with GMP through common ownership.  At or around the same time, GRM was formed to develop projects relating to the prospecting and exploration of industrial minerals and precious metals at mines and deposits located in Georgia.  *See* Onufrak Aff. at ¶ 1, attached hereto as **Ex. A**.

---

[1]  GMP's ownership consists of two (2) members: (1) Vancom Financial Services, Inc., which owns approximately ninety-seven percent (97%) of the company; and (2) Jurgen Meyer who owns three percent (3%) of the company.

In or around January 2006, GMP and GRM began looking for investors to provide them with financial assistance to carry on their business ventures in the countries of the former Soviet Union and to fund their operating costs.  (*Id.* at ¶ 2).

At or around this same time period, Plaintiff Daniel Lozinsky ("Plaintiff") had a telephone conversation with Mr. Ernest Stern to ascertain whether Mr. Stern's firm, Schiff Hardin, LLP, could provide legal services on various investment matters.  During this telephone conversation, Plaintiff inquired whether Mr. Stern knew of investment opportunities where Plaintiff could take an active management role rather than being merely a passive investor.  *See* Stern Aff. at ¶¶ 1-2, attached hereto as **Ex. B**.  Plaintiff and Mr. Stern knew each other through Mr. Stern's involvement as outside counsel for Mobilepro, a company where Plaintiff had, prior to his resignation, served as one of its Board of Directors.[2]  (*Id.* at ¶ 3).  Mr. Stern represented Mobilepro in negotiating a $200,000 investment from Plaintiff in or about 2002.  Plaintiff represented in his investment documents that he was an accredited investor under Rule 501 of Regulation D of the Securities Act of 1933, as amended.  (*Id.*).

During a subsequent telephone conversation, Mr. Stern told Plaintiff that he was corporate counsel for GMP and GRM and that these entities were searching for sophisticated investors to provide capital to enable them to continue their project development activities in the countries of Ukraine and Georgia, that such an investment opportunity might be of interest to Plaintiff given that he was born and raised in the Ukraine.  (*Id.* at ¶ 4).  Plaintiff expressed an immediate interest in this investment

---

[2]  Similar to this matter, Plaintiff invested $200,000.00 in Mobilepro in or about 2002.  As a result of this investment, Plaintiff signed a subscription agreement and received shares of stock in Mobilepro equal to his investment.  (Stern Aff. at ¶ 3).

opportunity and requested Mr. Stern to arrange a meeting with the principals of GMP and GRM so he could evaluate the prudence of such an investment. (*Id.* at ¶ 5). Mr. Stern honored Plaintiff's request.

In or around February 2006, Plaintiff met with the principals of GMP and GRM, Messrs. John Onufrak and Herman Hohauser, at Schiff Hardin, LLP, in Washington, D.C., to discuss this potential investment endeavor.[3] (*Id.* at ¶ 6). During the three hour meeting, Messrs. Onufrak and Hohauser gave Plaintiff a presentation concerning: (i) the status of project development of: (i) CBM/CMM projects in Ukraine and Georgia which import and use western technology to increase the safety and efficiency of coal mines and to establish CBM/CMM recovery and utilization in the respective coal basins and thereby stimulate economic development in the coal mining industry located in those countries; (ii) an industrial mineral mine modernization and expansion project ongoing in Georgia; and (iii) a project to develop the prospecting and exploration of gold deposits in Georgia. (Onufrak Aff. at ¶ 6).

At this meeting, Messrs. Onufrak and Hohauser discussed with Plaintiff the working capital requirements and financing needed by GMP and GRM to fund these projects. (*Id.* at ¶ 7). Plaintiff stated that he understood the Defendants' capital needs and the project financing requirements. Plaintiff stated that he had the financial resources and interest to provide the necessary funding for the Defendants. (*Id.*). Messrs. Onufrak and Hohauser explained to Plaintiff the details of major expenses that needed to be financed to complete development of the projects which included, but were not limited to, operating costs to cover: (i) travel; (ii) language and interpreting services; (iii)

---

[3] Mr. Stern did not attend the meeting, but simply arranged for the parties to meet at a mutually convenient site. (Stern Aff. at ¶ 6).

technical support services; and (iv) professional services; and (v) general administrative expenses. (*Id.*). Messrs. Onufrak and Hohauser also explained to Plaintiff the risks associated with the successful completion of the projects which included, but were not limited to, debt financing through the Overseas Private Investment Corporation ("OPIC"), political stability, and the arrangement of strategic industry partners both within and outside Ukraine and Georgia. Plaintiff stated that he understood the aforementioned risks and acknowledged that any funding that he furnished would be applied to ongoing project development costs. (*Id.* at ¶ 8).

Plaintiff expressed that he was very interested in pursuing this investment opportunity and that he was interested in playing an active role in GMP and GRM. The Defendants stated their interest in having Plaintiff invest in the companies and to be an active Board member and to participate in the senior management.

At the meeting, Plaintiff requested an opportunity to review additional project information. During the days following the meeting, Plaintiff received from the Defendants substantial materials and exhibits concerning the projects under development in Ukraine and Georgia, such as bank financing documentation (including OPIC loan processing), feasibility assessments relating to geology and engineering, business plans, and financial analyses of the projects. (*Id.* at ¶ 9).

Plaintiff reviewed the materials and discussed with Messrs. Onufrak and Hohauser his questions and comments. (*Id.*). Plaintiff also informed these principals that he was reviewing the projects with other advisors to assess the risks and opportunities of the prospective investment. (*Id.*). Plaintiff discussed with Messrs. Onufrak and Hohauser his desire for an ownership interest in GMP and GRM in exchange for the

infusion of a substantial cash investment in these entities. (*Id.*). Accordingly, on February 14, 2006, GMP offered Plaintiff a 3.3% ownership interest in GMP in exchange for his investment of $100,000 in GMP, which was needed to fund ongoing project development and the general operations of GMP. (*Id.* at ¶ 10). Plaintiff responded to this proposal by requesting a larger percentage ownership of GMP in exchange for a larger investment. Messrs. Onufrak and Hohauser agreed to provide Plaintiff with a 5% interest in GMP for an investment of $165,000. (*Id.*)

On February 17, 2006, and February 24, 2006, Plaintiff wired a total of $80,000 into a J.P. Morgan Chase account in New York.[4] The account was maintained by Vancom Financial Services, Inc., which is a member of GRM. (Compl. at ¶¶ 11-12).

Shortly thereafter, Messrs. Onufrak and Hohauser invited Plaintiff to attend an investment forum co-sponsored by The World Bank and the Government of Georgia in New York City during the first week of March 2006. The conference speakers spoke of Georgia's very favorable investment environment. Plaintiff was introduced to several important people, including the Prime Minister of Georgia, senior officials from various U.S. Government agencies and from International Finance Corporation ("IFC") who spoke specifically about ongoing projects being developed by GMP and GRM. (Onufrak Aff. at ¶ 12). Plaintiff expressed his satisfaction with the relationships and contacts formed by GMP and GRM with these entities and with the positive view of the Defendants' projects by the officials attending the investment forum on Georgia. (*Id.*).

During this time in New York City, Mr. Onufrak met with Plaintiff to discuss the entire range of project opportunities in both in Georgia and Ukraine. On behalf of GMP

---

[4] On each date, Plaintiff wired $40,000.00 into the J.P. Morgan Chase account.

and GRM, Mr. Onufrak provided Plaintiff with additional project informational materials. (*Id.* at ¶ 13).

Following the conference and meetings in New York, Plaintiff continued his review of the development activities of GMP and GRM, frequently inquiring and discussing the details of the projects, and the requirements for potential growth of GMP and GRM. Plaintiff requested participation in GRM and Messrs. Onufrak and Hohauser agreed to provide Plaintiff with a 10% interest in GRM in exchange for an investment of $180,000. (*Id.* at ¶ 14). The combined total investment that Plaintiff stated he would commit to GMP and GRM was $345,000. On behalf of GMP and GRM, Messrs. Onufrak and Hohauser confirmed to Plaintiff that he could play an active role on the boards of GMP and GRM, as well as actively participate in the senior management of the companies. (*Id.* at ¶¶ 14-15).

Following receipt of the initial payments of $80,000, on March 23, 2006, Mr. Onufrak sent Plaintiff a "Summary of Transaction Terms" ("Summary") that reflected the agreement reached between Defendants and Plaintiff regarding his investment in GMP and GRM. (*Id.* at ¶ 16). Defendants received no indication from Plaintiff that he disagreed with the Summary. *See* Summary of Term Transactions, attached hereto as **Ex. C**.

Under the Summary, Defendants offered Plaintiff two (2) options with respect to the repayment of his investment: (1) a promissory note reflecting his cash investment with a preferred rate of return of 12% of the principal ("Promissory Note Option"); or (2) a convertible note from the Defendants which would allow Plaintiff to convert his

monetary investment into equity ownership in these entities ("Convertible Note Option"). (Onufrak Aff. at ¶ 16). Plaintiff does not dispute this fact. (Compl. at ¶ 19).

Under the Promissory Note Option, the Defendants offered to repay Plaintiff's cash investments as soon as the projects were generating net revenues sufficient to allow such repayment. (Onufrak Aff. at ¶ 17). With respect to the Convertible Note Option, Plaintiff would only receive a return on his investment upon a "liquidity event," such as a sale of GMP and/or GRM, in an amount sufficient to allow a distribution of cash to the equity holders. (*Id.*). The Defendants never guaranteed Plaintiff that he would have his investment returned either in whole or in part. (*Id.* at ¶ 18). Following his receipt of the Summary, Plaintiff wired $50,000 into Chevy Chase Savings Bank for the account of John Onufrak on March 24, 2006. Again, on April 21, 2006, Plaintiff wired an additional $50,000.00 to Wachovia Bank for the account of GMP. (Compl. at ¶¶ 13-14).

In or around April 2006, Defendants received a letter from Michael Mannix, counsel to Plaintiff, requesting several documents concerning GMP and GRM, such as company formation documents and agreements among their shareholders, as well as employment agreements with the principals. The Defendants assembled the available materials requested by Plaintiff's counsel and on May 5, 2006, and May 8, 2006, delivered key documents to Plaintiff, which included the convertible note purchase agreement, GMP's Certificate of Incorporation and Bylaws, GRM's Operating Agreement, contracts that the Defendants had entered into in connection with projects in Ukraine, and a stock certificate equal to 750 shares of GMP to reflect his full equity investment in GMP. (Stern Aff. at ¶¶ 9-10). The Defendants had previously committed to provide these materials to Plaintiff, particularly the note and stock certificate, as set

forth in the Summary.  (*Id.*); *see also* July 10, 2006 email from Ernest Stern to Plaintiff's counsel, attached hereto as **Ex. D**.

The Defendants were completing compilation of additional documents for Plaintiff when, by email message of June 14, 2006, Plaintiff's counsel communicated to the Defendants that he wanted an immediate return of his money.  (Stern Aff. at ¶ 12); *see* June 14, 2006 email, attached hereto as **Ex. E**.  The Defendants were shocked by Plaintiff's demand because he had expressed a clear comprehension of the business plans for the projects, including the structure and financing mechanisms for the projects, and understood the capital investment required by the companies.  The Defendants were also puzzled by this reverse position because Plaintiff had made statements to the Defendants in the preceding several months about his sophistication as an investor and that his agreement to proceed with his investment despite the risks associated therewith.

At all times, Plaintiff was an accredited investor under applicable SEC regulations and was always represented and advised by counsel.  (Stern Aff. at ¶¶ 3,10).  For Plaintiff to complain that the Defendants have wrongfully and without justification retained his money investment under circumstances where it would be unjust to do so is at odds with the evidence and Plaintiff's course of conduct.

## II.    <u>LEGAL STANDARD</u>

Under Fed. R. Civ. P. 56, a district court is authorized to grant summary judgment where "… there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate in circumstances where "… the evidence is such that a reasonable jury could not return a verdict for the non-moving party."  *Id.*  In

deciding a motion for summary judgment, the district court views the evidence in the light most favorable to the non-moving party. *See Washington Post Co. v. U.S. Dept. Of Health And Human Services, et al.*, 865 F.2d 320, 324 (D.C. Cir. 1989). To stave-off a properly presented motion for summary judgment, the non-moving party may not rest upon the mere allegations in his pleadings, but must set forth specific facts showing a genuine issue for trial. *Anderson*, 477 U.S. at 248, 250. Only disputes over facts which might affect the outcome of the suit will preclude entry of summary judgment. *Id.* at 248.

Pursuant to Fed. R. Civ. P. 12(b)(6), a court will dismiss a complaint when a plaintiff can prove no set of facts in support of his claims. *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. 1994). A court need not accept inferences unsupported by the facts set out in the complaint nor legal conclusions cast in the form of factual allegations. *Id.*

## III.    LEGAL ARGUMENT

### A.    Plaintiff's Claim For Unjust Enrichment Is Not Ripe Because Plaintiff Fails To Allege That The Defendants Have Not Put The Money To Its Intended Use.

"Unjust enrichment occurs when a person retains a benefit (usually money) which in justice and equity belongs to another." *4934, Inc. v. DC Dept. of Emp. Serv's*, 605 A.2d 50, 55 (D.C. 1992). For a plaintiff to recover on this claim, he must show that the defendant was unjustly enriched at his expense and that the circumstances are such that in good conscience the defendant should make restitution. *See Kramer Associates, Inc. v. IKAM, Ltd.*, 888 A.2d 247 (D.C. 2005). Unjust enrichment claims do not require fault by the person who received the benefit. *4934, Inc.*, 605 A.2d at 55.

Although factually distinguishable from the present case, *Kramer* provides useful guidance. There, a Ghana-based corporation, IKAM, paid a D.C.-based consulting company $75,000 as a retainer to help IKAM secure investors for a construction project in Ghana, in the absence of a written agreement. Ultimately, the D.C.-based consulting company did virtually nothing to help IKAM secure investors, apart from sending a few faxes, and ultimately no investors were found. Based on these facts, the Court determined that the defendant had accepted $75,000 but performed no services that would permit it to keep the funds. In doing so, the Court found that the defendant had been unjustly enriched.

Applying these principles, no contract exists that would address the terms by which the Plaintiff could recoup his investment (if at all). Unlike the corporate defendant in *Kramer*, GMP and GRM have performed substantial work in an effort to realize a return on Plaintiff's investment and to fund their development projects necessary to realize an investment return for everyone. The Defendants have used Plaintiff's money to fund the numerous expenses normally associated with international project development including, but not limited to, travel, translation and interpreting services, bank retainer fees, geological and engineering services, project management, in-country transportation and security services, administrative and operating overhead, and legal and accounting fees in connection with Defendant's development projects located in Ukraine and in Georgia. (Onufrak Aff. at ¶¶ 7, 21).

Unlike the defendant in *Kramer*, Plaintiff is a sophisticated investor who knew the intended use of his funds, never objected to that use, appreciated its risks, and ratified such use. *See, e.g.*, *Leviten v. Bickley, Mandeville & Wimple, Inc.*, 35 F.2d 825, 827 (2d

Cir. 1927) (holding that the doctrine of ratification has been defined as the "subsequent adoption and affirmance by a person of an act which another, without authority, has previously assumed to do for him while purporting to act as an agent."). Moreover, virtually every step of the way, Plaintiff had legal counsel and kept informed as to the status of ongoing projects in the countries where GMP and GRM are developing projects. (Stern Aff. at ¶¶ 3, 10). Under those circumstances, Plaintiff has no factual or legal basis from which to lodge a complaint against the Defendants.

**B.    Plaintiff Freely And Voluntarily Invested Money In GMP And GRM Knowing Full Well That There Would Be No Guarantees On The Amount Of His Investment Return Or The Timing Of Such Return.**

Simply put, Plaintiff has buyer's remorse. Plaintiff is attempting to recoup money that he voluntarily and knowingly paid to the Defendants in connection with projects, in their nascent stages, occurring in Ukraine and the country of Georgia. On three (3) separate occasions, Plaintiff willingly made cash payments to GMP and GRM equal to $180,000 relating to these investment opportunities. It is undisputed that there were no guarantees made to Plaintiff in connection with the amount or timing of his investment return. Moreover, Plaintiff knew that his cash investment was being applied towards the Defendants' operating costs necessary to fund their natural resources development projects in these countries. Finally, Plaintiff knew that the Defendants would retain and use this investment for such purposes and ratified such conduct. *Leviten, supra.*

Under such circumstances, Plaintiff cannot as a matter of law establish a claim for unjust enrichment because the Complaint is completely devoid of any allegation that the Defendants were not entitled to retain and use the money that they received from him. Moreover, there exists no documentary evidence which shows that the Defendants' use of

this money was improper or inequitable.  *See, e.g.*, *Roebling v. Dillon*, 288 F.2d 386 (D.C. Cir. 1961) (upholding lower court's determination that shareholder's claim for unjust enrichment against a corporation failed as a matter of law because "there was no evidence that the corporation was not entitled to retain any benefit that it had received."); *Rosenkoff v. Finkelstein*, 195 F.2d 203 (D.C. Cir. 1952) (an unjust enrichment claim cannot lie where "it is plain that the appellant acted without any purpose of benefiting appellees or any expectation that they would pay him, and solely because he thought his supposed contract with them would enable him to make a profit.").

In light of these legal principles, Plaintiff's claim must be dismissed because he provided GMP and GRM with investment money for the intended and express purpose of benefiting their international development projects, he had no assurance as to when or how much he would be repaid for such investment, and he refused and failed to execute the appropriate legal documents which would have protected and secured his investment. In brief, Plaintiff is a sophisticated investor who understood the risk involved with his investment and the fact that he would not be guaranteed a return of his full investment let alone a profit.

## C.    The Doctrine Of Estoppel Bars Plaintiff's Claim.

Fair dealing between parties requires that one who acts to his detriment on the conduct of another party should be protected by precluding the party who has brought about the situation from alleging anything in opposition to the natural consequences of his own course of conduct. *See e.g., Goodman v. Dicker*, 169 F.2d 684, 685 (D.C. Cir. 1948) ("he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the

12

expectations upon which he acted … [s]uch a change of position is sternly forbidden.")
(citing *Dickerson v. Colgrove*, 100 U.S. 578, 580 (1880)).   Thus, a party claiming
estoppel must show reliance upon the conduct of the party to be estopped and action
based thereon of such a character as to change his position prejudicially.  *See Hardison v.
Shirlington Trust Co.*, 148 A.2d 88 (D.C. 1959).

In the present case, Plaintiff's own conduct has brought about the situation of
which he now complains and to the detriment of the Defendants.  Plaintiff voluntarily
provided investment money to GMP and GRM knowing full well the use of such money.
In addition, Plaintiff knew that GMP and GRM needed investment money because it
simply did not have the cash reserves to fund these projects.  On three separate occasions,
Plaintiff wired money into accounts maintained by GMP and GRM for the purpose of
funding operating and investment costs in connection with their CBM/CMM extraction
projects.

Relying on Plaintiff's conduct, the Defendants applied this money to such use and
it cannot be returned without loss to the Defendants.  Plaintiff's reverse position is now
jeopardizing the Defendants' business operations because they have been forced to divert
money which otherwise would have been applied towards ongoing CBM/CMM
extraction projects.

Finally, it must be noted that it strains credulity and defies common sense for
Plaintiff, a person of obvious wealth and investment experience, to now assert that he is
entitled to a complete return of the money, which he so gratuitously invested in GMP and
GRM.   If Plaintiff's position is accepted, it would mean that every investor who
experienced a slump in his initial investment would be entitled to complete

reimbursement.  Clearly, investments such as the type performed by Plaintiff do not offer guarantees.  In addition, Plaintiff was given every opportunity to protect his investment and chose not to do so.  In that regard, Plaintiff bore the risk associated with his investment and cannot now seek to shift this risk to the Defendants.

IV.     **<u>CONCLUSION</u>**

For all the reasons set forth above, Defendants request that this Court grant summary judgment in their favor or, alternatively, dismiss the Complaint.

Respectfully submitted,

BREGMAN, BERBERT, SCHWARTZ & GILDAY, LLC

By:     <u>/s/ Edward P. Henneberry</u>
        Edward P. Henneberry, # 15251
        Bregman, Berbert, Schwartz & Gilday, LLC
        7315 Wisconsin Avenue, Suite 800 West
        Bethesda, Maryland 20814
        (301) 656-2707
        *Counsel for Defendants*

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DANIEL LOZINSKY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GEORGIA RESOURCES MGMT., LLC | ) | Case No. 1:07CV00377 |
| | ) | |
| and | ) | |
| | ) | |
| GLOBAL METHANE PARTNERS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF JOHN ONUFRAK

I, John Onufrak, being over eighteen years of age and competent to testify in a court of law, do hereby depose and state as follows:

1.      I am the Managing Director of Global Methane Partners, Inc. ("GMP") and of Georgia Resources Management, LLC ("GRM").  GMP and GRM were formed in 2004 for the purpose of exploring opportunities in connection with the development of commercial projects for the recovery and utilization of Coal Bed Methane/Coal Mine Methane ("CBM/CMM") and the development of projects for prospecting, exploration, and production of other natural resources in Ukraine and the country of Georgia.

2.      In or around January 2006, GMP and GRM began looking for investors to provide them with financial assistance to carry on their project development activities in these countries of the former Soviet Union ("FSU") and to fund their operating costs in connection therewith.

3.      In or around February 2006, corporate counsel for GMP and GRM, Ernest M. Stern, contacted me and informed me that Mr. Daniel Lozinsky ("Plaintiff") had been in contact with him, and was interested in pursuing investment opportunities in connection with emerging companies, particularly where he could play an active management role.

4.      Mr. Stern told me that he had informed Mr. Lozinsky as to the status and progress of GMP and GRM's CBM/CMM developmental projects in Ukraine and Georgia.  In addition, Mr. Stern told me that Mr. Lozinsky might be willing to invest in such projects after meeting with me and Mr. Herman Hohauser, the principals of GMP and GRM, to evaluate the prudence and risks associated with investing in such projects in Ukraine and Georgia.

5.      I told Mr. Stern that Mr. Hohauser and I would be willing to meet with Mr. Lozinsky at a mutually convenient site to discuss the nature of these international development projects, the type and amount of working capital needed by the companies, and the ownership stake or other interest that we could provide to Mr. Lozinsky in exchange for such investment.  Mr. Stern said he would arrange such a meeting.

6.      Accordingly, in or around February 2006, Mr. Hohauser and I met with Mr. Lozinsky, at Schiff Hardin, LLP, in Washington, D.C., to discuss this potential investment undertaking as well as the prudence of this investment from his standpoint. The meeting lasted approximately three (3) hours and we gave Mr. Lozinsky a presentation concerning: (i) the status of development of CBM/CMM projects in Ukraine and Georgia, which import and use western technology to increase the safety and efficiency of coal mines, and to establish CBM/CMM recovery and utilization in the

respective coal basins and thereby stimulate economic development in the coalmining industry located in those countries; (ii) an industrial mineral mine modernization and expansion project under development in Georgia; and (iii) a project to develop the prospecting and exploration of gold deposits in Georgia.

7.      At this meeting, we discussed with Mr. Lozinsky the working capital needed by GMP and GRM, and the financing requirements of these projects.  Mr. Lozinsky stated that he understood GMP and GRM's funding requirements and that he had the financial resources and interest to provide the necessary funding for the companies.  At the meeting, we explained to Mr. Lozinsky the details of the major expenses that needed to be funded to complete development of the projects, which included, but were not limited to, operating costs to cover: (i) travel; (ii) general administrative and overhead expenses; (iii) language services; (iv) technical support services; and (v) professional services.

8.      We explained to Mr. Lozinsky the risks associated with the successful completion of the projects which included, but were not limited to, debt financing through the Overseas Private Investment Corporation ("OPIC"), the arrangement of strategic industry partners both within and outside Ukraine and Georgia, and the regional political stability.  Mr. Lozinsky stated that he understood the aforementioned risks and acknowledged that any financing that he supplied would be applied to ongoing project development costs.

9.      At the meeting, Mr. Lozinsky reviewed project materials and discussed his questions and comments with Mr. Hohauser and me.  At the meeting, Mr. Lozinsky requested an opportunity to review additional project information; subsequently, we

provided Mr. Lozinsky with substantial project materials and exhibits concerning the GMP and GRM projects in Ukraine and Georgia, such as bank financing documentation (including OPIC loan processing), feasibility assessments relating to geology and engineering, business plans, and financial analyses of the projects. Mr. Lozinsky was in nearly daily communication with me as he reviewed the development projects, and informed me of his interest in pursuing the investment opportunity, and that he was very interested in having an active role in GMP and GRM. Mr. Lozinsky also informed Mr. Hohauser and me that he was reviewing the projects other advisors to assess their risks and opportunities of this potential investment. Mr. Lozinsky discussed with us his desire for an ownership interest in GMP and GRM in exchange for the infusion of a substantial cash investment in these entities.

10.    On February 14, 2006, GMP offered Mr. Lozinsky a 3.3% ownership interest in the company in exchange for his investment of $100,000 in GMP, which was needed to fund ongoing project development and general operations of the company. Mr. Lozinsky responded to this proposal by requesting a larger percentage ownership of GMP in exchange for a larger investment. Mr. Hohauser and I agreed to provide Mr. Lozinsky with a 5% interest in GMP in return for his investment of $165,000.

11.    On February 17, 2006, and February 24, 2006, Mr. Lozinsky wired a total of $80,000 into a J.P. Morgan Chase account in New York. The account was maintained by Vancom Financial Services, Inc., a majority shareholder of GMP and a member of GRM.

12.    Shortly thereafter, I invited Mr. Lozinsky to attend an investment forum co-sponsored by The World Bank and the Government of Georgia in New York City in

early March 2006. I introduced Mr. Lozinsky to several important people including the Prime Minister of Georgia, senior officials from various U.S. Government agencies, and high-ranking officials from International Finance Corporation ("IFC") who spoke about the ongoing projects being developed by GMP and GRM in Georgia and Ukraine. Mr. Lozinsky expressed that he was impressed by the relationships and contacts formed by GMP and GRM with these entities, and that he was very satisfied with the positive view concerning the development projects occurring in Ukraine and Georgia, put forth by the officials.

13. At the conference, and during the time in New York, I discussed with Mr. Lozinsky in further detail the entire range of project opportunities in both in Ukraine and Georgia and provided him with additional project informational materials.

14. Following the conference, Mr. Lozinsky made frequent inquiries to me concerning details of the projects and the requirements for potential growth of GMP and GRM. Mr. Lozinsky requested to invest in GRM, and he was offered a 10% interest in the company in exchange for his investment of $180,000. The combined total investment that Mr. Lozinsky stated he would commit to GMP and GRM was $345,000.

15. On behalf of GMP and GRM, Mr. Hohauser and I agreed to give Mr. Lozinsky an active role on the boards of the companies as well as active participation in the senior management of the companies.

16. Following receipt of Mr. Lozinsky's initial investment of $80,000, on March 23, 2006, I sent Mr. Lozinsky a "Summary of Transaction Terms" ("Summary") that reflected the agreement reached between him and GMP and GRM concerning his investment in the companies. Under the Summary, GMP and GRM offered Mr. Lozinsky

two (2) options with respect to the repayment of his investment: (1) a promissory note reflecting his cash investment with a preferred rate of return of 12% of the principal ("Promissory Note Option"); or (2) a convertible note from GMP or GRM which would allow Mr. Lozinsky to convert his monetary investment into equity ownership in these entities ("Convertible Note Option"). Mr. Lozinsky never responded or objected to either of these options.

17.    Under the Promissory Note Option, GMP and GRM offered to repay Mr. Lozinsky's cash investments as soon as the projects in Ukraine and Georgia were generating net revenues sufficient to allow such repayment. With respect to the Convertible Note Option, Mr. Lozinsky would only receive a return on his investment upon a "liquidity event", such as a sale of GMP and/or GRM in an amount sufficient to allow a distribution of cash to the equity holders.

18.    At no time did Mr. Hohauser or I make any guarantees to Mr. Lozinsky that he would have his investment returned either in whole or in part. On March 24, 2006, following receipt of the Summary, Mr. Lozinsky wired $50,000 into Chevy Chase Savings Bank maintained in my name. Again, on April 21, 2006, Mr. Lozinsky wired $50,000.00 to Wachovia Bank for the account of GMP.

19.    In or around April 2006, we (through counsel) received a letter from Michael Mannix, counsel to Mr. Lozinsky, requesting several documents concerning GMP and GRM's company formation and agreements among the companies' shareholders. In response to this request, I helped assemble several materials. On May 5, 2006, and May 8, 2006, I delivered to Mr. Lozinsky the convertible note purchase agreement, GMP's articles of incorporation and bylaws, GRM's operating agreement,

contracts that GMP and GRM had entered into in connection with projects in Ukraine, and a stock certificate equal to 750 shares of GMP to reflect his entire equity investment in GMP of $165,000, which is the amount Mr. Lozinsky had committed to fund.

20.    On or about June 14, 2006, I learned from counsel that Mr. Lozinsky had demanded an immediate return of his cash investment. I was shocked by Mr. Lozinsky's reverse position because he had expressed a clear comprehension of the business plans for the projects, including the structure and financing mechanisms for the projects, and understood the capital investment required by the companies. In addition, Mr. Lozinsky had made statements to Mr. Hohauser and me in the preceding months about his success and experience as an investor, and that he agreed to proceed with his investment despite the risks associated therewith.

21.    Nonetheless, by that juncture, Mr. Lozinsky's cash investment had been spent and applied towards various business and operating costs such as project management, travel, language services, geological and engineering services, in-country logistics, bank retainer fees, administrative and overhead expenses, and legal and accounting expenses.

22.    Further Affiant sayeth not.

## AFFIRMATION

I SOLEMNLY AFFIRM UNDER THE PENALTIES OF PERJURY AND UPON PERSONAL KNOWLEDGE THAT THE CONTENTS OF THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT.


Date: _____        By: _____

                                          John Onufrak

State of _____

County of _____

Personally appeared before me, a Notary Public, in and for said county and state, on this _____ day of _____, 2006, the within named John Onufrak, known to me, or satisfactorily proven, to be the person whose name is subscribed to the within the instrument and who acknowledges that he executed the same for the purpose therein contained.

_____
Notary Public

Print Name:  _____

My Commission Expires:

_____

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DANIEL LOZINSKY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| GEORGIA RESOURCES MGMT., LLC | )    Case No. 1:07CV00377 |
| | ) |
| and | ) |
| | ) |
| GLOBAL METHANE PARTNERS, INC. | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT OF JOHN ONUFRAK

I, John Onufrak, being over eighteen years of age and competent to testify in a court of law, do hereby depose and state as follows:

1.    I am the Managing Director of Global Methane Partners, Inc. ("GMP") and of Georgia Resources Management, LLC ("GRM"). GMP and GRM were formed in 2004 for the purpose of exploring opportunities in connection with the development of commercial projects for the recovery and utilization of Coal Bed Methane/Coal Mine Methane ("CBM/CMM") and the development of projects for prospecting, exploration, and production of other natural resources in Ukraine and the country of Georgia.

2.    In or around January 2006, GMP and GRM began looking for investors to provide them with financial assistance to carry on their project development activities in these countries of the former Soviet Union ("FSU") and to fund their operating costs in connection therewith.

3.  In or around February 2006, corporate counsel for GMP and GRM, Ernest M. Stern, contacted me and informed me that Mr. Daniel Lozinsky ("Plaintiff") had been in contact with him, and was interested in pursuing investment opportunities in connection with emerging companies, particularly where he could play an active management role.

4.  Mr. Stern told me that he had informed Mr. Lozinsky as to the status and progress of GMP and GRM's CBM/CMM developmental projects in Ukraine and Georgia.  In addition, Mr. Stern told me that Mr. Lozinsky might be willing to invest in such projects after meeting with me and Mr. Herman Hohauser, the principals of GMP and GRM, to evaluate the prudence and risks associated with investing in such projects in Ukraine and Georgia.

5.  I told Mr. Stern that Mr. Hohauser and I would be willing to meet with Mr. Lozinsky at a mutually convenient site to discuss the nature of these international development projects, the type and amount of working capital needed by the companies, and the ownership stake or other interest that we could provide to Mr. Lozinsky in exchange for such investment.  Mr. Stern said he would arrange such a meeting.

6.  Accordingly, in or around February 2006, Mr. Hohauser and I met with Mr. Lozinsky, at Schiff Hardin, LLP, in Washington, D.C., to discuss this potential investment undertaking as well as the prudence of this investment from his standpoint. The meeting lasted approximately three (3) hours and we gave Mr. Lozinsky a presentation concerning: (i) the status of development of CBM/CMM projects in Ukraine and Georgia, which import and use western technology to increase the safety and efficiency of coal mines, and to establish CBM/CMM recovery and utilization in the

respective coal basins and thereby stimulate economic development in the coalmining industry located in those countries; (ii) an industrial mineral mine modernization and expansion project under development in Georgia; and (iii) a project to develop the prospecting and exploration of gold deposits in Georgia.

7.      At this meeting, we discussed with Mr. Lozinsky the working capital needed by GMP and GRM, and the financing requirements of these projects.  Mr. Lozinsky stated that he understood GMP and GRM's funding requirements and that he had the financial resources and interest to provide the necessary funding for the companies.  At the meeting, we explained to Mr. Lozinsky the details of the major expenses that needed to be funded to complete development of the projects, which included, but were not limited to, operating costs to cover: (i) travel; (ii) general administrative and overhead expenses; (iii) language services; (iv) technical support services; and (v) professional services.

8.      We explained to Mr. Lozinsky the risks associated with the successful completion of the projects which included, but were not limited to, debt financing through the Overseas Private Investment Corporation ("OPIC"), the arrangement of strategic industry partners both within and outside Ukraine and Georgia, and the regional political stability.  Mr. Lozinsky stated that he understood the aforementioned risks and acknowledged that any financing that he supplied would be applied to ongoing project development costs.

9.      At the meeting, Mr. Lozinsky reviewed project materials and discussed his questions and comments with Mr. Hohauser and me.  At the meeting, Mr. Lozinsky requested an opportunity to review additional project information; subsequently, we

provided Mr. Lozinsky with substantial project materials and exhibits concerning the GMP and GRM projects in Ukraine and Georgia, such as bank financing documentation (including OPIC loan processing), feasibility assessments relating to geology and engineering, business plans, and financial analyses of the projects. Mr. Lozinsky was in nearly daily communication with me as he reviewed the development projects, and informed me of his interest in pursuing the investment opportunity, and that he was very interested in having an active role in GMP and GRM. Mr. Lozinsky also informed Mr. Hohauser and me that he was reviewing the projects other advisors to assess their risks and opportunities of this potential investment. Mr. Lozinsky discussed with us his desire for an ownership interest in GMP and GRM in exchange for the infusion of a substantial cash investment in these entities.

10. On February 14, 2006, GMP offered Mr. Lozinsky a 3.3% ownership interest in the company in exchange for his investment of $100,000 in GMP, which was needed to fund ongoing project development and general operations of the company. Mr. Lozinsky responded to this proposal by requesting a larger percentage ownership of GMP in exchange for a larger investment. Mr. Hohauser and I agreed to provide Mr. Lozinsky with a 5% interest in GMP in return for his investment of $165,000.

11. On February 17, 2006, and February 24, 2006, Mr. Lozinsky wired a total of $80,000 into a J.P. Morgan Chase account in New York. The account was maintained by Vancom Financial Services, Inc., a majority shareholder of GMP and a member of GRM.

12. Shortly thereafter, I invited Mr. Lozinsky to attend an investment forum co-sponsored by The World Bank and the Government of Georgia in New York City in

early March 2006.  I introduced Mr. Lozinsky to several important people including the Prime Minister of Georgia, senior officials from various U.S. Government agencies, and high-ranking officials from International Finance Corporation ("IFC") who spoke about the ongoing projects being developed by GMP and GRM in Georgia and Ukraine.  Mr. Lozinsky expressed that he was impressed by the relationships and contacts formed by GMP and GRM with these entities, and that he was very satisfied with the positive view concerning the development projects occurring in Ukraine and Georgia, put forth by the officials.

13.    At the conference, and during the time in New York, I discussed with Mr. Lozinsky in further detail the entire range of project opportunities in both in Ukraine and Georgia and provided him with additional project informational materials.

14.    Following the conference, Mr. Lozinsky made frequent inquiries to me concerning details of the projects and the requirements for potential growth of GMP and GRM.  Mr. Lozinsky requested to invest in GRM, and he was offered a 10% interest in the company in exchange for his investment of $180,000.  The combined total investment that Mr. Lozinsky stated he would commit to GMP and GRM was $345,000.

15.    On behalf of GMP and GRM, Mr. Hohauser and I agreed to give Mr. Lozinsky an active role on the boards of the companies as well as active participation in the senior management of the companies.

16.    Following receipt of Mr. Lozinsky's initial investment of $80,000, on March 23, 2006, I sent Mr. Lozinsky a "Summary of Transaction Terms" ("Summary") that reflected the agreement reached between him and GMP and GRM concerning his investment in the companies.  Under the Summary, GMP and GRM offered Mr. Lozinsky

two (2) options with respect to the repayment of his investment: (1) a promissory note reflecting his cash investment with a preferred rate of return of 12% of the principal ("Promissory Note Option"); or (2) a convertible note from GMP or GRM which would allow Mr. Lozinsky to convert his monetary investment into equity ownership in these entities ("Convertible Note Option"). Mr. Lozinsky never responded or objected to either of these options.

17.    Under the Promissory Note Option, GMP and GRM offered to repay Mr. Lozinsky's cash investments as soon as the projects in Ukraine and Georgia were generating net revenues sufficient to allow such repayment. With respect to the Convertible Note Option, Mr. Lozinsky would only receive a return on his investment upon a "liquidity event", such as a sale of GMP and/or GRM in an amount sufficient to allow a distribution of cash to the equity holders.

18.    At no time did Mr. Hohauser or I make any guarantees to Mr. Lozinsky that he would have his investment returned either in whole or in part. On March 24, 2006, following receipt of the Summary, Mr. Lozinsky wired $50,000 into Chevy Chase Savings Bank maintained in my name. Again, on April 21, 2006, Mr. Lozinsky wired $50,000.00 to Wachovia Bank for the account of GMP.

19.    In or around April 2006, we (through counsel) received a letter from Michael Mannix, counsel to Mr. Lozinsky, requesting several documents concerning GMP and GRM's company formation and agreements among the companies' shareholders. In response to this request, I helped assemble several materials. On May 5, 2006, and May 8, 2006, I delivered to Mr. Lozinsky the convertible note purchase agreement, GMP's articles of incorporation and bylaws, GRM's operating agreement,

contracts that GMP and GRM had entered into in connection with projects in Ukraine, and a stock certificate equal to 750 shares of GMP to reflect his entire equity investment in GMP of $165,000, which is the amount Mr. Lozinsky had committed to fund.

20.     On or about June 14, 2006, I learned from counsel that Mr. Lozinsky had demanded an immediate return of his cash investment.  I was shocked by Mr. Lozinsky's reverse position because he had expressed a clear comprehension of the business plans for the projects, including the structure and financing mechanisms for the projects, and understood the capital investment required by the companies.  In addition, Mr. Lozinsky had made statements to Mr. Hohauser and me in the preceding months about his success and experience as an investor, and that he agreed to proceed with his investment despite the risks associated therewith.

21.     Nonetheless, by that juncture, Mr. Lozinsky's cash investment had been spent and applied towards various business and operating costs such as project management, travel, language services, geological and engineering services, in-country logistics, bank retainer fees, administrative and overhead expenses, and legal and accounting expenses.

22.     Further Affiant sayeth not.

### AFFIRMATION

I SOLEMNLY AFFIRM UNDER THE PENALTIES OF PERJURY AND UPON PERSONAL KNOWLEDGE THAT THE CONTENTS OF THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT.


Date: _04 April 2007_   By: _____

                              John Onufrak

State of  _UIRGINIA_____

County of  _ARLINGTON_____

Personally appeared before me, a Notary Public, in and for said county and state, on this _4TH_ day of _April_ _SLC_, 2006, the within named John Onufrak, known to me, or satisfactorily proven, to be the person whose name is subscribed to the within the instrument and who acknowledges that he executed the same for the purpose therein contained.

_____
Notary Public

Print Name:  _Sandra L. Counts_____

My Commission Expires:

_11.30.2008_____

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DANIEL LOZINSKY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **GEORGIA RESOURCES MGMT., LLC** ) | **Case No. 1:07CV00377** |
| ) | |
| **and** ) | |
| ) | |
| **GLOBAL METHANE PARTNERS, INC.**) | |
| ) | |
| **Defendants.** ) | |
| ) | |

### AFFIDAVIT OF ERNEST M. STERN

I, Ernest M. Stern, being over eighteen years of age and competent to testify in a court of law, do hereby depose and state as follows:

1.      I am a Member of the Bar of the District of Columbia Court of Appeals, having been admitted to practice in 1976.  I am currently in private practice in the District of Columbia, as an equity partner in the firm of Seyfarth Shaw LLP.  My primary area of practice is corporate and securities work with an emphasis on emerging company practice.

2.      In or around January 2006, Daniel Lozinsky and I were discussing by telephone a prospective investment that he was considering.   In the course of that conversation he inquired whether I knew of any investment opportunities with companies where he could be actively involved rather than being a passive investor.

3.      I had previously known Mr. Lozinsky through my involvement as outside general counsel for Mobilepro Corp, a publicly traded company where Mr. Lozinsky served as a member of its Board of Directors, and for a portion of time as its sole Board

member.  In or about 2002, Mr. Lozinsky had invested $200,000.00 in Mobilepro and in return signed a stock subscription agreement wherein he received shares of stock in Mobilepro equal to his investment.  I was involved as counsel to Mobilepro Corp. when Mr. Lozinsky made this investment.   Mr. Lozinsky represented in the investment documents that he is an accredited investor.

4.     In a subsequent telephone conversation with Mr. Lozinsky discussing matters involving his investments and Mobilepro Corp., I told Mr. Lozinsky that I was corporate counsel for Global Methane Partners, Inc. ("GMP") and Georgia Resources Management, LLC ("GRM") and that these entities were looking for sophisticated investors to provide capital in connection with the commercial extraction and utilization of coal mine methane ("CMM") in the Ukraine and The Republic of Georgia and other projects, including gold mining.

5.     Mr. Lozinsky expressed an immediate interest in this investment opportunity and requested that I arrange a meeting with the principals of GMP and GRM so he could evaluate the prudence of such potential investment.

6.     Accordingly, in or around February 2006, I arranged a meeting between Mr. Lozinsky and the principals of GMP and GRM, Messrs. John Onufrak and Herman Hohauser, at Schiff Hardin LLP, in Washington, D.C., where I was an equity partner prior to joining Seyfarth Shaw LLP, to discuss this potential investment opportunity.  I did not attend the meeting or participate in any manner.

7.     In or around May 8, 2006, at the request of Mr. Lozinsky, I prepared on behalf of GMP and GRM, a convertible note which would allow Mr. Lozinsky to convert his monetary investment into equity ownership in GMP and GRM.  I also sent formation

documents of the Defendants and a stock certificate for shares of GMP to reflect his 5% ownership of GMP assuming that he would honor his commitment to provide funding to GMP of $165,000 under the Summary of Transaction Terms prepared by John Onufrak and sent to Mr. Lozinsky to reflect their agreement on the funding terms. This document did not reflect any guarantee to Mr. Lozinsky in connection with a return on his investment in GMP or GRM.

10.     Moreover, at all times during the course of GMP and GRM's dealings with Mr. Lozinsky, he was represented by counsel.  In April/May 2006, Mr. Lozinsky was represented by Mr. Michael Mannix, Esq., at Holland & Knight, LLP.  I had several discussions with Mr. Mannix concerning Mr. Lozinsky's investment in GMP and GRM. In early May 2006, and in response to inquiry from Mr. Mannix, I told him that I had provided Mr. Lozinsky with several, critical documents in connection with his investment which included, but were not limited to, the convertible note purchase agreement, GMP's certificate of incorporation and bylaws, GRM's operating agreement, contracts that the Defendants had entered into in connection with projects in the Ukraine, and a stock certificate equal to 750 shares of GMP to reflect the full equity investment of $165,000 that he had committed to John Onufrak that he would provide.

11.     Upon information and belief, Mr. Mannix was reviewing these legal documents but I never received any comments or proposed revisions to such documents.

12.     In or around June 2006, I learned from Mr. Onufrak that Mr. Lozinsky demanded an immediate return of his cash investment due to a change in the political climate between Russia and the Ukraine.

13.    However, by that juncture, Mr. Lozinsky's cash investment had been spent and applied towards various business and operating costs such as travel, lodging, translation, and legal and accounting expenses to further the progress on Defendants' projects.

14.    Further Affiant sayeth not.

## AFFIRMATION

I SOLEMNLY AFFIRM UNDER THE PENALTIES OF PERJURY AND UPON PERSONAL KNOWLEDGE THAT THE CONTENTS OF THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT.

Date: April 4, 2007    By: _____

Ernest M. Stern, Esq.

State of _____ District of Columbia

County of _____

Personally appeared before me, a Notary Public, in and for said county and state, on this _____ day of April , 2007, the within named Ernest M. Stern, known to me, or satisfactorily proven, to be the person whose name is subscribed to the within instrument and who acknowledges that he executed the same for the purpose therein contained.

_____
Notary Public

**Vanessa S. Hayward**
**Notary Public, District of Columbia**
**My Commission Expires 10/31/2007**

Print Name: _____

My Commission Expires:

October 31, 2007



GLOBAL METHANE PARTNERS, INC / GEORGIA RESOURCES MANAGEMENT, LLC

**SUMMARY OF TRANSACTION TERMS**
**Equity Financing / Conveyance of Stock**

| | |
|---|---|
| Parties to the Transaction: | Daniel Lozinsky ("Lozinsky");<br><br>Global Methane Partners, Inc. ("GMP");<br><br>Georgia Resources Management, LLC ("GRM") |
| Subject of Transaction: | Acquisition of shares in GMP and GRM, in consideration of Equity Financing, to be used for funding ongoing project development and for general operations of GMP and GRM. |
| Effective Date: | 1 March 2006 |
| Schedule of Paid-in Capital: | 15 February 2006 – $80,000 ($40,000 toward GMP and $40,000 toward GRM)<br><br>24 March 2006 – $65,000 ($25,000 toward GMP and $40,000 toward GRM)<br><br>07 April 2006 – $200,000 ($100,000 toward GMP and $100,000 toward GRM) |
| Subject of Equity Financing: (Projects) | *As regards GMP:*<br><br>Coal bed/Coalmine Methane Recovery and Utilization Projects under development in Ukraine, Georgia, Kazakhstan (the "GMP Projects" and/or the "GMP Project Companies").<br><br>*As regards GRM:*<br><br>Mining industry exploration and production projects, including industrial minerals (Diatomite), base metals (Copper); and precious metals (Gold) under development in Georgia. |

GLOBAL METHANE PARTNERS, INC / GEORGIA RESOURCES MANAGEMENT, LLC

| | |
|---|---|
| Interest in GMP (conveyed by Shareholder Agreement/Issued Shares): | Five percent (5%) ownership; Class A, Voting; Board of Directors |
| Interest in GRM (conveyed by Shareholder Agreement/Issued Shares): | Ten percent (10%) ownership; Class A, Voting Member; Board of Managers |
| Return on Equity Financing: (Preferred Return) | As calculated on outstanding principal, based on 12% APR; Preferred Return to accrue, and to be paid pro-rata together with payments towards Return of Capital |
| Return of Capital: (Priority Return) | Paid-in-capital to be returned prior to distribution to other shareholders; payments to Lozinsky under a Promissory Note to repay principal of Equity Financing (Paid-in Capital), to be made pro-rata within thirty (30) days following receipt by GMP or GRM of Project-related revenues and/or dividend/profit disbursements (net, after operating costs), including, but not limited to: (i) fees received under contracts for services in connection with the Projects; (ii) reimbursement of project cost expenditures from loans and/or other financing associated with the Projects; and (iii) capital returns from the sale or other disposition as an equity stakeholder in the Projects. |
| Instruments: | 1.  Convertible Note [GMP] in the amount of $165,000 |
| | 2.  Convertible Note [GRM] in the amount of $180,000 |
| | 3.  [Upon Conversion] Shareholders' Agreement and equivalent issued Stock Certificates for Global Methane Partners, Inc.; number of shares corresponding to 5% ownership of GMP |
| | 4.  [Upon Conversion] Operating Agreement and equivalent Membership Certificates for Georgia Resources Management, LLC; corresponding to 10% Member Ownership Interest in GRM |
| AGREED AND ACCEPTED: | On behalf of Global Methane Partners, Inc. and Georgia Resources Management, LLC: |
| | BY: John Onufrak _____ Date: _____ |
| | Daniel Lozinsky: _____ Date: _____ |

2/2

**J. Onufrak**

| | |
|---|---|
| **From:** | ERHoldings Ltd [erholdings@yahoo.co.uk] |
| **Sent:** | 23-Jan-07 09:22 |
| **To:** | IIO |
| **Subject:** | Fwd: Global Methane Partners and Georgia Resources Management/Daniel Lozinsky |

*"Stern, Ernest" <EStern@seyfarth.com>* wrote:

Subject: Global Methane Partners and Georgia Resources Management/Daniel Lozinsky
Date: Mon, 10 Jul 2006 08:41:23 -0400
From: "Stern, Ernest" <EStern@seyfarth.com>
To: <michael.mannix@hklaw.com>

Mike:
Thank you for your email of June 14th. I have moved to a new
law firm in the last two weeks and am finally receiving emails and
documents that were stored electronically from my prior law firm so I
apologize for the delay in responding to your email. In your email you
stated that Global Methane Partners, Inc. ("GMP") and Georgia Resources
Management LLC ("GRM"), our clients, had not provided any documents in
response to your request and that your client, Daniel Lozinsky, had not
been provided anything that shows his investment. First, we believe
that the most critical documents were provided in response to your
request and the request of Mr. Lozinsky in our emails of May 5, 2006
and May 8, 2006 , namely, the convertible notes to reflect Mr.
Lozinsky's
promised investment of $165,000 in GMP and $180,000 in GRM, a
Convertible Note Purchase Agreement between our clients, the certified
copy of GMP's certificate of incorporation, the filed Articles of
Organization of GRM, the Bylaws of GMP, the Operating Agreement of GRM
and the stock certificate for 750 shares of GMP that represented Mr.
Lozinsky's promised investment of $165,000. Additional documents were
requested, including contracts that GMP and GRM had entered into and
documents from OPIC to reflect the terms of the anticipated funding of
the Coal Mine Methane Demonstration Project in the Ukraine. As we
informed both you and Mr. Lozinsky, these documents were in the process
of being assembled and given the travel schedule of John Onufrak, of
which Mr. Lozinsky was well aware, the documents were finally assembled
and ready to be sent to you when we received your June 14th email.
Your email requests that Mr. Lozinsky be returned the money that
he has invested to date in GMP and GRM on the basis that this was
offered to him by Mr. Onufrak. My client discussed the possibility of
Mr. Lozinsky being returned his investment rather than converting it to
stock in GMP or an interest in GRM as contemplated in the convertible
notes that were sent to your client, but not an immediate return of his
funds. The request is difficult to understand, especially in light of

2007-01-23

Mr. Lozinsky's knowledge about the financial requirements of GMP and
GRM based upon numerous discussions that he had with Mr. Onufrak
regarding
the funding requirements for the various projects in which these
entities were involved.
By way of background, please understand that
we introduced Mr. Lozinsky to the principals of GPM and GRM on the basis

of Mr. Lozinsky's understanding of the Ukraine, Georgia and Kazakhstan
regions given where he was born and raised, his technical expertise to
understand the projects being undertaken by GMP and GRM and his
interest in finding an investment where he could play a role in the
company that
he would fund rather than being a passive investor. Mr. Lozinsky spent
a great deal of time in person and by phone discussing the various
projects in these regions that GMP and GRM were pursuing with Messrs.
Onufrak and Hohauser, the principals of GMP and GRM. He became very
interested in the projects and stated that he wanted a certain
percentage ownership in each entity and that he would invest $165,000
in GMP and $185,000 in GRM. He also discussed with Messrs. Onufrak and
Hohauser a role on the Board of Directors or some executive level
position with these entities. On the basis of his initial funding to
allow Mr. Onufrak to travel to Ukraine and Georgia and his
commitment to fund a total of $165,000 to GMP and $185,000 to GRM, Mr.
Onufrak initiated a number of actions and incurred expenses both
Present and future to implement the various projects that he had
discussed with
Mr. Lozinsky. The failure of Mr. Lozinsky to fulfill his financial
commitment to GMP and GRM now threatens the viability of the projects
that are summarized below.

Global Methane Partners, inc

1. UKRAINE - Coal Mine Methane Demonstration
Project (CMM-I)

Towards the development activities and costs, including
pre-implementation expenses, based on Mr. Lozinsky's funding commitment,
GMP:
* committed to its share of the costs
* engaged multiple professional and technical support
services
* increased personnel, both in the U.S. and in Ukraine

Without the remainder of Mr. Lozinsky's commitment being
funded, GMP faces interruption of performing its vital role in
development of the project and delays in settlement of loan; time is of
the essence because OPIC has programmed project financing of CMM-I for
the
FY-2006 budget allocation for this loan to the CMM-I Project; the
closing was

2007-01-23

originally expected by end of June, and GMP is now uncertain of how to support its
participating interest. FYI I was at the meeting between OPIC and GMP
representatives on June 22, 2006 and the OPIC loan officers and counsel were very interested
in completing the financing for this project.


2. GEORGIA - Coal Seam Methane Development Program (CBM/CMM Pilot Project)

Towards the pre-development activities, including
development expenses, based on Mr. Lozinsky's funding commitment, GMP:

resumed its role as the lead participant
and foreign sponsor in a Public-Private Partnership (P3), whereby GMP
represents the 'Private' sector as the project developer/manager for
the supply of goods and services in partnership with the Government of
Georgia (Ministry of Energy)

* committed to establish/continue the programmed development
activities, as represented to the U.S. Ambassador, the Chief of the
Tbilisi Mission for USAID as well as the head of the Energy &
Environment Section, the Government of Georgia, including, directly,
the Minister of Energy, the Minister of Environmental Protection and
Natural Resources, and the Minister of Economic Development

* engaged professional and technical assistance services

* added personnel both, in the U.S. and in Georgia

* executed financial obligations towards offices,
transportation, security, and language services

The failure of Mr. Lozinsky to honor his commitment for
funding has interrupted GMP's ability to proceed. Time is of the
essence, because GMP is in a position to fail in meeting its
commitments to the Government of Georgia. If this occurs, GMP will be
replaced in
its lead role and is subject to losing its equity participating
interest in the P3,
as well as the loss of its prior costs and of its recent expenditures,
which were made based on Mr. Lozinsky's commitment for a total funding.


3. KAZAKHSTAN - Coal Bed/Coal Mine Methane Program (Private
Sector CBM/CMM Projects)

Towards the pre-development activities, including
development expenses, based on Mr. Lozinsky's funding commitment, GMP:

\* received a delegation from the Government of Kazakhstan,
and presented our corporate capabilities and concept development plan
for coal mines in the Karaganda Coal Basin

\* committed to follow the previously-submitted proposals
to the top three coal mine operators, and to establish the process of
negotiating agreements for equity-based
projects

\* engaged professional and technical assistance services

Without the remainder of the Mr. Lozinsky's commitment
being funded, at this time GMP is unable to proceed with developing the
projects opportunities in Kazakhstan. Time is of the essence because
the Government of Kazakhstan and the major companies that operate the
coal mines are determined to expedite the related scoping studies and
to initiate the pilot projects. If GMP is unable to compete for the
lead
technical role with equity participation and, thus, obtain no
agreements
in Kazakhstan, it will lose all opportunity for participating in the
CBM/CMM industry in Kazakhstan.

Georgia Resources Management, llc.

1. 'KISATIBI' - Diatomite Deposit and Mine

Towards the development activities and costs, including
pre-implementation expenses, based on Mr. Lozinsky's funding commitment,
GRM:

\* increased its stake in the assets
\* committed to its continued and increased share of the
costs
\* engaged multiple services of support, both professional
and technical
\* increased personnel in the U.S. and in Georgia
\* commenced final negotiations with strategic industry
partner for equity participation
\* resumed project financing activity with International
Finance Corporation (IFC)

Without the remainder of Mr. Lozinsky's commitment being
funded, at this time GRM is faced with delay in proceeding with any
activities and responsibilities for this asset and the intended US$ 50
million Mine Modernization and Expansion Project. Time is of the
essence because (i) Eagle-Picher Filtration and Minerals, Inc. is
prepared to finalize negotiations with GRM for their buy-in to become
the operating partner; (ii) IFC is prepared to engage their full staff
and to mobilize World Bank Trust Funds for assisting with funding the

2007-01-23

resource audit necessary for the intended IFC financing of the Project;
and (iii) the Government of Georgia (including the Prime Minister and
the Minister of Environmental Protection and Natural Resources) has
received the GRM commitment to resume development of the deposit and
the Project.

The inability for GRM to receive the funds committed by
Mr. Lozinsky places in jeopardy the entire prior investment by GRM in
the Kisatibi Diatomite Mine and in the development of the Project. As
the Managing Partner of the venture with the in-country stakeholders,
GRM has committed to the partners to protect the license and to
Conclude the transaction with Eagle-Picher. Under current
circumstances, the
in-country partners are in a position to lose all of their investment,
interest, and rights to the Kisatibi deposit and license, should GRM be
incapable of proceeding with its renewed commitments, which were made
based in reliance on receiving Mr. Lozinsky's full funding commitment.

2. 'ZOPKHITO' - Gold Deposit License [2600 sq. km.],
with three Advanced-Stage Exploration Areas

Towards the development activities and costs, including
pre-implementation expenses, based on Mr. Lozinsky's funding commitment,
GMP:

* renewed its activities in developing the assets
* committed to its continued share of the costs
* re-engaged geo-technical services

Without the remainder of funding from Mr. Lozinsky, at
this time GRM is unable to proceed with development of the baseline for
raising the capital necessary to fund the exploration program. Time is
of the essence because GRM has contractual limitations on the time
allowed for GRM to commence the exploration program; and the in-country
stakeholder can terminate its agreement with GRM upon failure to
proceed.

As you can see, GMP and GRM are struggling to meet the
financial commitments that they have undertaken in reliance with the
promised funding by Mr. Lozinsky, facts of which your client was aware.
While GMP and GRM would like to be able to return Mr. Lozinsky's
investment, they will only be able to do so if and when the projects
are able to provide sufficient working capital to allow such repayment
as the discussions between our clients contemplated and the draft
convertible notes reflected.

Ernest Stern
Seyfarth Shaw LLP
815 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006-4004

2007-01-23

estern@seyfarth.com
202/828-5360 (O)
202/828-5393 (fax)
301/910-2030 (mobile)

Any tax information or written tax advice contained herein (including any attachments) is not intended to be and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer. (The foregoing legend has been affixed pursuant to U.S. Treasury Regulations governing tax practice.)

The information contained in this transmission is attorney privileged and/or confidential information intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

New Yahoo! Mail is the ultimate force in competitive emailing. Find out more at the Yahoo! Mail Championships. Plus: play games and win prizes.

2007-01-23

**From:**     "Stern, Ernest" <EStern@seyfarth.com>
**To:**       "Ted Henneberry" <THenneberry@bregmanlaw.com>
**Date:**     04/04/2007 2:54:36 PM
**Subject:**  FW: GMP and GRM

Ted: The June 14, 2006 email from Michael Mannix, counsel to Lozinsky.

Ernest Stern
Seyfarth Shaw LLP
815 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006-4004
estern@seyfarth.com
202/828-5360 (O)
202/828-5393 (fax)
301/910-2030 (mobile)


-----Original Message-----
From: J. Onufrak/PDFCO [mailto:project1494@earthlink.net]
Sent: Wednesday, April 04, 2007 12:05 PM
To: Stern, Ernest
Cc: IIO
Subject: Fw: GMP and GRM




-----Forwarded Message-----
>From: "Stern, Ernest" <EStern@seyfarth.com>
>Sent: Jun 19, 2006 1:18 PM
>To: jonufrak@pdfco.com
>Cc: hohauser@gmail.com
>Subject: Fw: GMP and GRM
>
>FYI.
>
>-------------------------
>
>
>-----Original Message-----
>From: Stern, Ernest M.
>To: Stern, Ernest
>Sent: Fri Jun 16 06:32:27 2006
>Subject: FW: GMP and GRM
>
>
>
>
>Ernest Stern
>Schiff Hardin LLP
>Suite 600
>1101 Connecticut Avenue, N.W.
>Washington, D.C. 20036
>202/778-6461 (Office Phone)
>202/778-6460 (fax)

>301/910-2030 (mobile)
>estern@schiffhardin.com
>
>
>
>_____
>
>From: michael.mannix@hklaw.com [mailto:michael.mannix@hklaw.com]
>Sent: Wednesday, June 14, 2006 10:32 AM
>To: Stern, Ernest M.
>Cc: Dlozin@aol.com
>Subject: RE: GMP and GRM
>
>
>Ernest, As you know, your client has not followed up on the email
below.  I spoke with Daniel several times yesterday.  To summarize, your
client has failed to provide any documents in response to my request,
and my client has not been provided anything that shows his investment.
Daniel is unwilling to provide any additional investment and believes he
should be repaid his initial investment for a number of reasons.  Your
client has agreed to repay him.
>
>Accordingly, demand is hereby made for return of the entirely of his
investment in both of the above companies.  In the event satisfactory
terms are not reached to repay him within 9 calendar days, or before the
close of business on June 23, I will conclude that your client does not
intend to make such provisions and I will advise Daniel of the remedies
he has to assert his rights.
>
>Lastly, Daniel has asked me to convey to you that you are not to call
him on any matter and that all communication on this matter should be
through my office.
>
>_____
>
>From: Stern, Ernest M. [mailto:estern@schiffhardin.com]
>Sent: Tuesday, May 30, 2006 8:42 AM
>To: michael.mannix@hklaw.com
>Subject: RE: GMP and GRM
>
>
>My client is out of the country so I will have to ask him about such an
offer of which I am not aware.
>
>Ernest Stern
>Schiff Hardin LLP
>Suite 600
>1101 Connecticut Avenue, N.W.
>Washington, D.C. 20036
>202/778-6461 (Office Phone)
>202/778-6460 (fax)
>301/910-2030 (mobile)
>estern@schiffhardin.com
>
>
>

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DANIEL LOZINSKY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **GEORGIA RESOURCES MGMT., LLC** | )     **Case No. 1:07CV00377** |
| | ) |
| **and** | ) |
| | ) |
| **GLOBAL METHANE PARTNERS, INC.** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## <u>ORDER</u>

Upon consideration of Defendants' Motion for Summary Judgment or, in the

Alternative, to Dismiss the Complaint, it is this _____ day of _____, 2007,

**ORDERED**, that the Defendants' Motion be and is hereby **GRANTED**.

_____
The Honorable John D. Bates
Judge, U.S. District Court for the
District of Columbia

cc:    Edward P. Henneberry, Esq.
       Robert C. Gill, Esq.

F:\Home\THenneberry\Global Methane\Motion to Dismiss\Order.doc