UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DANIEL LOZINSKY, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>GEORGIA RESOURCES, *et al.*, )<br>)<br>Defendants. ) | Case No. 1:07-CV-00377 |

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, TO DISMISS THE COMPLAINT

Plaintiff, Daniel Lozinsky ("Plaintiff"), submits the following opposition to the Motion for Summary Judgment, or in the Alternative, to Dismiss the Complaint (the "Motion"), filed by Defendants Georgia Resources Management, LLC ("GRM") and Global Methane Partners, Inc.'s ("GMP") (collectively referred to as "Defendants").

SUMMARY OF ARGUMENT

Defendants have responded to Plaintiff's Complaint seeking the return of monies admittedly paid by him to Defendants with a motion to dismiss, or in the alternative, for summary judgment. Defendants' Motion is supported only by two affidavits, an e-mail, and an unsigned, alleged "term" sheet. Distilled to its essence, Defendants' submission claims that Defendants are not obligated to return Plaintiff's money because Defendants completed a sale to Plaintiff of securities based on an *oral* agreement for which there are *no* documents. Even without one document signed by Plaintiff (or by Defendants, for that matter) to support Defendants' theory, Defendants ask for this case to be dismissed before discovery.

Defendants also argue that it was perfectly legal and proper for them to take Plaintiff's money, and for them to use that money, and that Plaintiff has no right to information about Defendants' use of his funds except for the generic claims that Plaintiff's money was used for

business purposes. Defendants have failed to produce any evidence to show that: 1) they were entitled to Plaintiff's funds, and 2) that they actually used Plaintiff's funds for specific and legitimate business purposes.

For these reasons Defendants cannot meet their heavy burden of showing that Plaintiff cannot establish any set of facts in support of his Complaint. Defendants' Motion should be denied, and Plaintiff should be given the opportunity to proceed to discovery and to present factual and expert evidence at a trial on the merits.

## COUNTER-STATEMENT OF MATERIAL FACTS

1. Plaintiff met attorney Earnest Stern in or about 2002 in connection with his investment in a financially troubled company named Neoreach that was represented by Mr. Stern. As part of his investment in Neoreach, Plaintiff purchased another company named Mobilepro, a public company whose stock was traded over the counter but which had little or no value other than as a "shell" company. The acquisition of Mobilepro provided the foundation for Neoreach to be publicly traded as an over the counter stock, which increased its stock value. (See Declaration of Daniel Lozinsky, attached hereto as Exhibit 1, para. 1).

2. In 2005 Plaintiff needed an opinion letter from Earnest Stern to be able to get access to his shares of stock in Mobilepro, the sale of which were restricted, and was in contact with Mr. Stern at his law firm's offices in D.C. for that purpose. Plaintiff was unable to obtain that opinion until early 2006. (Exhibit 1, para. 2).

3. In early 2006 Mr. Stern asked Plaintiff to come to the District of Columbia to meet with him, John Onufrak, and Herman Hohouser to learn about new ventures where he could invest some of the money earned from his Mobilepro investment and make more money. The implication was that Plaintiff's Mobilepro stock could be available for sale if some of the

proceeds could end up in these new ventures to which Mr. Stern had a connection. The new ventures were Georgia Resources Management, LLC and Global Methane Partners, Inc. (Exhibit 1, para. 3).

4. Plaintiff came to the District of Columbia for the requested meeting with Messrs. Stern, Onufrak and Hohauser for an approximate three hour presentation in the offices of Mr. Stern's law firm. He was told that Defendants were trying to improve safety for coal mining in the Ukraine on a profitable basis by capturing dangerous methane gasses and selling them. (Exhibit 1, para. 4).

5. Defendants also represented that they were attempting similar coal projects in Kazakhstan, and that they had a license to mine gold in The Republic of Georgia for a volume of one to four million ounces. (Exhibit 1, para. 5).

6. Defendants asked Plaintiff for a continuing investment, and indicated that they were willing to sell up to 25% of the ownership of both GMP and GRM. Defendants indicated that they needed money immediately for scheduled trips to Georgia and the Ukraine and for logistics. Mr. Stern was able to persuade Plaintiff to provide money because he had the ability to free up stock in Mobilepro that Plaintiff wanted to sell. This leverage was a critical reason why Plaintiff was willing to provide money to Defendants without a negotiated deal. Plaintiff was also told of an already-approved loan for $15,000,000 from the Overseas Private Investment Corporation ("OPIC"), which also was important to his decision. (Exhibit 1, para. 6).

7. The next day, on February 17, 2006, at the request of Defendants Plaintiff wired $40,000 to JP Morgan Chase NY National Financial Services for the account of Vancom Financial Services, Inc. Vancom Financial Services, Inc. is a Virginia corporation and a member of GRM. (Exhibit 1, para. 7).

8. A few days later Plaintiff received the opinion letter that he had been seeking from Mr. Stern for some time relating to his ownership of shares in Mobilepro. Plaintiff retained counsel from WilmerHale to assist him in freeing up his Mobilepro stock, but it seemed that the wire transfer did what Plaintiff's counsel could not. (Exhibit 1, para 8).

9. On February 24, 2006, at the request of Defendants, Plaintiff wired another $40,000 to JP Morgan Chase NY National Financial Services for the account of Vancom Financial Services, Inc. (Exhibit 1, para. 9).

10. On March 24, 2006, at the request of Defendants, Plaintiff wired $50,000 to Chevy Chase Savings Bank for the account of John Onufrak. (Exhibit 1, para. 10).

11. On April 21, 2006, at the request of Defendants, Plaintiff wired $50,000.00 to Wachovia Bank for the account of GMP. (Exhibit 1, para. 11).

12. During this time period and after, Plaintiff asked Defendants and Mr. Stern, their counsel, for documentation regarding GMP and GRM, such as financial statements, business plans, a copy of the gold license, articles of incorporation or bylaws. No documents were provided to Plaintiff by Defendants or Mr. Stern in response to his requests. Plaintiff therefore had no idea how many investors the Defendants had, how many shares of stock Defendants had issued, what assets the Defendants had, what debts or other liabilities the Defendants had, or what the value of an ownership interest in Defendants would be worth. (Exhibit 1, para. 12).

13. Plaintiff expected that he would be given the opportunity to review and verify information about Defendants so that he could negotiate the terms of any investment and be satisfied that the terms would be reasonable under the circumstances. The advances Plaintiff previously gave were intended as demand loans against a possible equity investment he could make if the terms were agreeable. The parties never reached an agreement on the terms and

conditions of any investment by Plaintiff in the Defendant entities. (Exhibit 1, para. 13).

14.     In April, 2006, Plaintiff attended an "investors forum" in New York. He was then told by Defendants that for $165,000 he could own 5% of GMP, and for $185,000 he could own 10% of GRM. Based on earlier statements made by Defendants, Plaintiff thought he would own significantly more stock in each entity. (Exhibit 1, para. 14).

15.     In the Spring of 2006 Plaintiff retained counsel, Michael Mannix, Esquire, of Holland & Knight, to assist him in either negotiating and finalizing an investment in GMP and GRP or recovering the advance provided to the Defendants. On Plaintiff's behalf, Mr. Mannix sent Mr. Stern a request for information which was attached to Defendants' Motion as Exhibit D. Mr. Stern responded to that e-mail, and on or about May 19, 2006 provided his proposed "Convertible note Purchase Agreement." Under the terms of these notes, Plaintiff would have the option of being repaid his investment or converting the investment into stock ownership. However, Plaintiff would have to invest considerably more monies in order to do so, and the terms, which were never agreed to, were extremely unfavorable and unacceptable. (Exhibit 1, para. 15).

16.     John Onufrak continued to request that Plaintiff make more money available to Defendants. Onufrak kept representing, among other things, that Defendants were going to obtain the $15,000,000 loan from OPIC, but that they needed additional monies as a bridge until this loan came through. Meanwhile, Defendants and Mr. Stern continued to stonewall Plaintiff, and failed and refused to produce any meaningful documentation regarding GMP or GRM. (Exhibit 1, para. 16).

17.     As recently as December 2006 and early January, 2007, Defendants, through their counsel Mr. Stern, refused to meet with Plaintiff's counsel regarding Defendants and refused to

produce any documents regarding the Defendants or their operations. (Exhibit 1, para. 17).

18.     Defendants admit that *after* they received the first two installments of Plaintiff's money, Mr. Onufrak sent Plaintiff the "summary of terms" document that was attached to Defendants' Motion as Exhibit C. Defendants' Memorandum in support of their Motion ("Def. Mem.") at 6. The "Convertible note Purchase Agreement" was transmitted to Plaintiff's counsel, Mr. Mannix, on May 19, 2006, after all four of Plaintiff's installment payments to Defendants. In other words, *after* Plaintiff had already sent Defendants money they requested, Defendants then attempted to unilaterally dictate the terms of the transaction.

19.     There are no documents signed by any party hereto that evidence or reflect an agreement by Plaintiff to invest money in Defendants.

## ARGUMENT

I.    UNJUST ENRICHMENT CLAIMS REQUIRE AN INTENSELY FACTUAL INQUIRY AND ARE NOT APPROPRIATE FOR SUMMARY JUDGMENT.

Defendants claim that they are entitled to summary judgment on Plaintiff's unjust enrichment claim because "he has failed to allege or present any evidence to show that the Defendants have not performed substantial work in connection with his investment money or that they have retained or put such money to other than its intended purpose." Def. Mot. at 1. Defendants miss the point, in that they have failed to establish that they are entitled to retain Plaintiff's monies in the first instance for any purpose. They also have failed to produce any meaningful evidence as to their factually-based defense, even assuming that they could establish an initial entitlement to Plaintiff's funds.

Whether Defendants have been unjustly enriched is an intensely factual inquiry and the issue is not appropriate for summary judgment, especially at the initial stages of this litigation with no discovery having been completed. *See 4934, Inc v. District of Columbia Department of*

*Employment Services*, 605 A.2d 50, 56 (D.C. 1992) (the court recognizes that "every unjust enrichment case is factually unique, for whether there has been unjust enrichment must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution, and those dealings will necessarily vary from one case to the next"); *Kramer Associates, Inc. v. Ikam*, 888 A.2d 247 (D.C. 2005) (trial conducted to determine validity of unjust enrichment claim). *Kramer,* the case that Defendants themselves rely on, stands for the proposition that an unjust enrichment claim requires an intensely factual inquiry that is best decided by the fact finder at trial. *See Kramer*, 888 A.2d at 254-255 (sustaining unjust enrichment claim after testimony and documents were presented to support and refute the claim).

  Moreover, even if unjust enrichment claims can be appropriate for summary judgment, discovery is necessary to flesh out the claim and defenses. Unjust enrichment occurs when a person retains a benefit (usually money) which in justice and equity belongs to another." *4934, Inc v. District of Columbia Department of Employment Services*, 605 A.2d 50, 55 (D.C. 1992). The self-serving and conclusory statements in Defendants' affidavits do not show that: 1) Defendants were entitled to keep Plaintiff's funds, and that 2) Defendants used those funds as agreed by the parties. To the contrary, the record in this case shows affirmatively that there is an absence of any proof of an agreement in writing signed by Plaintiff which gave Defendants rights to Plaintiff's funds. Defendants' use of these funds is irrelevant.

  Defendants also assert that they are entitled to summary judgment because they used Plaintiff's money for its intended purpose "to fund numerous expenses normally associated with international project development." Def. Mem. at 10. Defendants' statement that Plaintiff's money has been used to "fund numerous expenses" rings hollow without detailed evidence regarding the actual expenses paid and an explanation how these expenses furthered the projects.

Discovery is needed to establish whether the work done thus far with Plaintiff's money has been sufficient and adequate.  In *Kramer*, the court found that a consulting firm had been unjustly enriched even though there was evidence it had done some work to secure financing for a project, because the court found that not enough had been done.  888 A.2d at 255.  As *Kramer* demonstrates, whether an adequate amount of work has been done to justify Defendants' retention of Plaintiffs money is a factual issue that needs to be further explored through discovery.  Contrary to Defendants' assertion, the record fails to demonstrate that Defendants used Plaintiff's funds for legitimate business purposes.

Defendants assert that Plaintiff has no factual or legal basis from which to lodge a complaint because "unlike the defendant in *Kramer*, …[he was a] sophisticated investor who knew the intended use of his funds, never objected to that use, appreciated its risks, and ratified such use."  Pl. Mem. at 10-11.  However, there is no indication in *Kramer*, that the Plaintiff there was not a sophisticated investor.  In fact, the Plaintiff in *Kramer* was the chairman of the board of the Ghana-based corporation seeking investors, which supports that he was likely a sophisticated investor.  888 A.2d at 249.  Additionally, the *Kramer* court did not examine the sophistication level of the investor in determining whether he should win on his unjust enrichment claim.  As such, in the instant case, the sophistication level of Plaintiff has no bearing on whether the Defendants have been unjustly enriched by retaining his funds without just cause.

II. THE DEFENSE OF ESTOPPEL IS FACTUAL IN NATURE AND NOT PROPER FOR RESOLUTION ON SUMMARY JUDGMENT.

Defendants also argue that their defense of estoppel bars Plaintiff's claim because "Plaintiff's own conduct has brought about the situation of which he now complains and to the detriment of Defendants."  Pl. Mem. at 12-13.  Defendants reliance on this defense is highly ironic, since they seem to claim injury to themselves for having taken and enjoyed Plaintiff's

-8-

money without justification. Defendants also ignore the fact that application of this defense involves an intensely factual inquiry not appropriate for resolution on summary judgment.

A showing of estoppel requires: "(1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of real facts." *Hardison v. Shirlington Trust Co.*, 148 A.2d 88 (D.C. 1959). Defendants fail to demonstrate that they satisfy these criteria. Additionally, the defense of estoppel is not appropriate for summary judgment and typically requires findings by the trier of fact. *See id.* at 90 ("[u]nless only one inference can be drawn from the evidence, the existence of an estoppel is a question to be determined by the jury").

Because Defendants failed to establish the threshold factors showing that they are even able to properly raise the defense of estoppel, and certainly cannot show that only one inference can be drawn from the evidence in a case where discovery has not begun, Defendant's Motion based on the defense of estoppel must be denied.

WHEREFORE, Plaintiff requests that Defendants' Motion be denied.

Respectfully submitted,
Saul Ewing LLP


/s/ Robert C. Gill_____
Robert C. Gill (D.C. Bar# 413163)
Shannon H. Bates (D.C. Bar# 480186)
2600 Virginia Avenue, NW
Suite 1000 – The Watergate
Washington, D.C. 20037
Tel:   202-295-6600
Fax:   202-295-6700
*Counsel for Plaintiff Daniel Lozinsky*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DANIEL LOZINSKY, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 1:07-CV-00377 |
| | ) |
| GEORGIA RESOURCES, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment Or, In the Alternative, To Dismiss the Complaint (the "Motion"), the opposition thereto filed by Plaintiff, and the reply, if any, of Defendants.

It appearing to the Court that good cause does not exist to grant the Motion;

It is on this _____ day of _____, 2007

ORDERED that the Motion is hereby denied;

IT IS FURTHER ORDERED that Defendants shall file an answer to the Complaint within twenty (20) days from the date of this Order.

_____
United States District Judge

**CERTIFICATE OF SERVICE**

     I certify that on this 7th day of May, 2007, a true and correct copy of the foregoing was sent via first class mail, postage pre-paid, to:

Edward P. Henneberry, Esquire
Bregman, Berbert, Schwartz & Gilday, LLC
7315 Wisconsin Avenue, Suite 800 West
Bethesda, Maryland  20814

                                                _/s/ Robert C. Gill_
                                                  Robert C. Gill

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DANIEL LOZINSKY, | ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 1:07-CV-00377 |
| GEORGIA RESOURCES, *et al.*, | ) ) ) |
| Defendants. | ) ) |

### DECLARATION OF DANIEL LOZINSKY

My name is Daniel Lozinsky. I am a competent adult citizen and resident of the United States and the State of New Jersey. I have personal knowledge of the facts set forth herein, and if called to testify, I would and could give testimony as to these facts.

1. I met attorney Earnest Stern in or about 2002 in connection with my investment in a financially troubled company named Neoreach that was represented by Mr. Stern. As part of my investment in Neoreach, I purchased another company named Mobilepro, a public company whose stock was traded over the counter but which had little or no value other than as a "shell" company. The acquisition of Mobilepro provided the foundation for Neoreach to be publicly traded as an over the counter stock, which increased its stock value.

2. In 2005 I needed an opinion letter from Earnest Stern to be able to get access to my shares of stock in Mobilepro, the sale of which were restricted, and was in contact with Mr. Stern at his law firm's offices in D.C. for that purpose. I was unable to obtain that opinion until early 2006.

3. In early 2006 Mr. Stern asked me to come to the District of Columbia to meet with him, John Onufrak, and Herman Hohouser to learn about new ventures where I could invest some of the money earned from my Mobilepro investment and make more money. The

implication was that my Mobilpro stock could be available for sale if some of the proceeds could

end up in these new ventures, ventures to which Mr. Stern had a connection. The new ventures were Georgia Resources Management, LLC ("GRM) and Global Methane Partners, Inc. ("GMP").

4. I came to the District of Columbia for the requested meeting with Messrs. Stern, Onufrak and Hohauser for an approximate three hour presentation in the offices of Mr. Stern's law firm. I was told that Defendants were trying to improve safety for coal mining in the Ukraine on a profitable basis by capturing dangerous methane gasses and selling them.

5. Defendants also represented that they were attempting similar coal projects in Kazakhstan, and that they had a license to mine gold in The Republic of Georgia for a volume of one to four million ounces.

6. Defendants asked me for a continuing investment, and indicated that they were willing to sell up to 25% of the ownership of both GMP and GRM. Defendants indicated that they needed my money immediately for scheduled trips to Georgia and the Ukraine and for logistics. Mr. Stern was able to persuade me to provide money because he had the ability to free up my stock in Mobilepro that I wanted to sell. This leverage was a critical reason why I was willing to provide money to Defendants. I was also told of an already-approved loan for $15,000,000 from the Overseas Private Investment Corporation ("OPIC"), which also was important to my decision.

7. The next day, on February 17, 2006, at the request of Defendants I wired $40,000 to JP Morgan Chase NY National Financial Services for the account of Vancom Financial Services, Inc. Vancom Financial Services, Inc. is a Virginia corporation and apparently a member of GRM.

8. A few days later I received the opinion letter that I had been seeking from Mr.

Stern for some time relating to my ownership of shares in Mobilepro. I had retained counsel from WilmerHale to assist me in freeing up my Mobilepro stock, but it seemed that my wire transfer did what my counsel could not.

9. On February 24, 2006, at the request of Defendants, I wired another $40,000 to JP Morgan Chase NY National Financial Services for the account of Vancom Financial Services, Inc.

10. On March 24, 2006, at the request of Defendants, I wired $50,000 to Chevy Chase Savings Bank for the account of John Onufrak.

11. On April 21, 2006, and at the request of Defendants, I wired $50,000.00 to Wachovia Bank for the account of GMP.

12. During this time period and after, I asked Defendants and Mr. Stern, their counsel, for documentation regarding GMP and GRM, such as financial statements, business plans, a copy of the gold license, articles of incorporation or bylaws. No documents were provided to me by Defendants or Mr. Stern in response to my requests. I therefore had no idea how many investors the Defendants had, how many shares of stock Defendants had issued, what assets the Defendants had, what debts or other liabilities the Defendants had, or what the value of an ownership interest in Defendants would be worth.

13. I expected that I would be given the opportunity to review and verify information about Defendants so that I could negotiate the terms of any investment and be satisfied that the terms would be reasonable under the circumstances. The advances I previously gave were intended as demand loans against a possible equity investment I could make if the terms were agreeable. We never reached an agreement on the terms and conditions of any investment by me

in the Defendant entities.

14. In April, 2006, I attended an "investors forum" in New York. I was then told by Defendants that for $165,000 I could own 5% of GMP, and for $185,000 I could own 10% of GRM. Based on earlier statements made to me by Defendants I thought I would own significantly more stock in each entity.

15. In the Spring of 2006 I retained counsel, Michael Mannix, Esquire, of Holland & Knight, to assist me in either negotiating and finalizing an investment in GMP and GRP or recovering the advance I provided to the Defendants. On my behalf Mr. Mannix sent Mr. Stern a request for information which was attached to Defendants' Motion as Exhibit D. Mr. Stern responded to that e-mail, and on or about May 19, 2006 provided his proposed "Convertible note Purchase Agreement." Under the terms of these notes, I would have the option of being repaid my investment or converting the investment into stock ownership. However, I would have to invest considerably more monies in order to do so, and the terms, which were never agreed to by me, were extremely unfavorable and unacceptable to me.

16. John Onufrak continued to request that I make more money available to Defendants. Onufrak kept representing, among other things, that Defendants were going to obtain the $15,000,000 loan from OPIC, but that they needed additional monies as a bridge until this loan came through. Meanwhile, Defendants and Mr. Stern continued to stonewall me, and failed and refused to produce any meaningful documentation regarding GMP or GRM.

17. As recently as December 2006 and early January, 2007, Defendants, through their counsel Mr. Stern, refused to meet with my counsel regarding my investment and also refused to produce any documents regarding the Defendants or their operations.

Pursuant to 28 U.S.C. §1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 7 day of May, 2007.

_____
Daniel Lozinsky